IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE

# EDDIE BROWN LIMBAUGH, Executor of the Estate of EMMA RUTH LIMBAUGH v. COFFEE MEDICAL CENTER, ET AL.

**Direct Appeal from the Circuit Court for Coffee County**
**No. 28-936    John W. Rollins, Judge**

---

**No. M1999-01181-COA-R3-CV - Decided May 31, 2000**

---

In January 1997, Emma Ruth Limbaugh, an Alzheimer's patient in Coffee Medical Center's nursing home, received injuries to her face and arm during an altercation with one of the Medical Center's certified nursing assistants, Louise Ray. Limbaugh's son, Eddie Brown Limbaugh (Plaintiff),[1] subsequently filed a complaint against the Medical Center and Ray in which he alleged that his mother's injuries were caused when she was assaulted by Ray. The Medical Center filed an answer, a motion to dismiss, and a motion for summary judgment raising the affirmative defense of governmental immunity. The trial court dismissed the Plaintiff's claim that the Medical Center was vicariously liable for Ray's "intentional assault;" however, the court permitted the Plaintiff to proceed to trial on his claim that the Medical Center was negligent in hiring and/or retaining Ray. At the conclusion of a bench trial, the trial court found that Limbaugh's injuries were caused by Ray's "assault and battery." The trial court also found that the Medical Center had prior notice of Ray's propensity for "physical aggressiveness" and that the Medical Center's failure to take corrective action was the "direct and proximate legal cause" of Limbaugh's injuries. Based upon these findings, the trial court entered a judgment against Ray in the amount of $25,000 and a judgment against the Medical Center in the amount of $40,000. We affirm the trial court's judgment against Ray based upon our conclusion that the evidence does not preponderate against the court's decision; however, we reverse the trial court's judgment against the Medical Center because we conclude that, regardless of whether the Plaintiff's claim was based upon the theory of vicarious liability or the theory of negligent retention, the Governmental Tort Liability Act (GTLA) did not permit the Plaintiff to sue the Medical Center for Ray's intentional tort.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in part; Reversed in Part; and Remanded**

---

[1]The Plaintiff originally filed this action as the conservator for his mother. While this action was pending, Limbaugh died, and the Plaintiff moved to revive the action as the executor of his mother's estate.

FARMER, J., delivered the opinion of the court, in which CRAWFORD, P.J., W.S., and HIGHERS, J., joined.

Michael M. Castellarin, Nashville, Tennessee, for the appellant, Coffee Medical Center.

H. Thomas Parsons, Manchester, Tennessee, for the appellee, Eddie Brown Limbaugh, Executor of the Estate of Emma Ruth Limbaugh.

Louise Ray, Manchester, Tennessee, appellee, *Pro Se*.

**OPINION**

On the afternoon of January 19, 1997, Louise Ray's supervisor, Betty Adams, a licensed practical nurse, was pushing a medicine cart down the hall of the Medical Center's nursing home when she heard a noise coming from Emma Ruth Limbaugh's room. When Adams entered the room to investigate, she saw Ray and Limbaugh engaged in some sort of struggle on Limbaugh's bed. Ray was using her left hand to grab at Limbaugh's arms, and Ray's right hand was clenched in a fist. Adams yelled, "No, Louise," because she "felt like there might be a potential for a lick"; however, Adams did not see Ray strike Limbaugh.

Adams soon noticed that Limbaugh had a hematoma near her right eyebrow and a lump on her right jaw. Blood ran from Limbaugh's mouth and right nostril, so Adams packed Limbaugh's nostril with Vaseline and gauze to stop the bleeding. Later that afternoon, Adams noticed that Limbaugh had another hematoma near her left eyebrow. Adams reported the incident to Medical Center administrators. A subsequent examination by Limbaugh's treating physician at the Medical Center, Harrison Yang, revealed that Limbaugh had bruises around both eyes, a bruise on the right side of her face, and a skin tear on her right forearm. Dr. Yang also observed that Limbaugh had a deviated septum, but he noted that this condition could have existed at Limbaugh's birth or been caused by a previous injury.

Shortly after the incident, Limbaugh's relatives were called to the nursing home. When Limbaugh's daughter, Lina Baker, arrived, she observed that Limbaugh's face and neck were black and blue, her nose was "over to one side," she was bleeding from her nose and mouth, she had a big knot on the right side of her face, and her right arm was bleeding from where someone had dug her fingernails into the arm. Limbaugh's son, the Plaintiff, indicated that his mother looked like "[a] lady that had the hell beat out of her." According to the Plaintiff, Limbaugh's face was bruised, she had a cut over her right eye, and her nose was "a little crooked."

The Plaintiff and Baker acknowledged that their mother suffered from Alzheimer's disease and that on some days she appeared confused and did not recognize family members. In December 1996, Limbaugh had suffered other more serious facial injuries, including a fractured nose and maxillary sinus, when she fell after escaping from her bed restraints. Moreover, a couple of weeks after the January 19, 1997, incident, Limbaugh began to suffer from a series of mini-strokes.

Despite Limbaugh's previous facial injuries and her other health problems, the Plaintiff and Baker insisted that they noticed a marked change in their mother's condition due to the January 19, 1997, incident. At trial, Baker testified that

> there was a definite change in Mother. You had to speak to her before you got real close or she would just start with her hands like a baby, you know. . . . She wouldn't talk. She was withdrawn, and she was just afraid, genuinely afraid of people.

Baker testified that, after the January 19, 1997, incident, Limbaugh could eat only pureed food because her sinus problems caused her to choke easily. Limbaugh also had difficulty breathing through her nose after the incident. Because she was forced to breathe through her mouth all of the time, her tongue became so dry that it cracked and bled.

> The Plaintiff corroborated his sister's testimony regarding their mother's labored breathing, dry mouth, and diet of pureed food.[2] The Plaintiff added that

> it seemed like that after this incident she had a lot more times that she was, you know, more or less out of it, in a stupor. She was [kind of] incoherent. She wouldn't really recognize you and this kind of stuff, a lot more of that afterwards.

Louise Ray represented herself at trial. After taking the witness stand, Ray testified that she did not know how Limbaugh was injured. Ray acknowledged that she and Limbaugh engaged in a struggle of sorts on Limbaugh's bed. Ray maintained, however, that she merely grabbed Limbaugh in an attempt to prevent her from falling off of the bed. As Ray attempted to reposition Limbaugh on the bed, Limbaugh suddenly became combative and struck Ray in the ear. When Betty Adams entered the room, Ray was trying to grab Limbaugh's arms to prevent Limbaugh from striking her again.

In support of his negligent retention claim, the Plaintiff sought to show that the Medical Center had prior notice of Ray's propensity for violence because of an incident that occurred in early January 1997. Jennie Louise Cox, whose mother-in-law was a patient at the Medical Center's nursing home, testified that she had an altercation with Louise Ray on January 1, 1997. According to Cox, she jokingly admonished and shook her finger at Ray after Ray complained that a patient expected her to wash the patient's dishes. Ray reportedly responded by grabbing Cox's finger, digging in her fingernails, and bending Cox's hand backwards. Ray finally released Cox's finger, but Cox still had a faint scar on her thumb from where one of Ray's fingernails dug into the skin. Cox reported this incident to Shirley Price, the Medical Center's Director of Nursing, and Price completed a "Record of Complaint" on the incident.

---

[2]The Medical Center's monthly summaries, however, indicated that Limbaugh was eating a diet of pureed food as early as December 1996.

Due to the Cox incident, two of Ray's supervisors, Betty Adams and Mary Arwood, were asked to submit written evaluations of Ray's work. Although these evaluations included some positive observations of Ray's work, Betty Adams reported that Ray was "short with residents," that she did not "use enough patience," and that her tone of voice was too "harsh" at times. Mary Arwood similarly noted that at times Ray's tone of voice indicated a "lack of patience with residents."

Instead of terminating Ray for the Cox incident, the Medical Center disciplined Ray by placing her on probation for one year. Less than three weeks later, Ray was involved in the incident in which Limbaugh was injured. Limbaugh died in April 1998 from causes that were unrelated to the January 19, 1997, incident.

Both the Plaintiff and the Medical Center filed notices that they were appealing the trial court's judgment. In its brief, the Medical Center has raised the following issues for this court's review:

> 1.      Should the trial court have dismissed the plaintiff's claims against Coffee Medical Center upon motion to dismiss at the end of the plaintiff's proof or at the end of all proof based upon the plaintiff's failure to show by competent evidence that Coffee Medical Center failed to meet the relevant standard of professional practice in regard to the alleged negligent hiring or retention of Louise Ray and/or based upon the plaintiff's failure to prove that Ms. Louise Ray, had a history of tortious conduct toward patients with whom she had previously worked.

> 2.      Was the trial court in error in holding that the defendant, Coffee Medical Center, has "a fiduciary duty to protect the lives and safety of its residents" as opposed to applying the standard set out in the Tennessee Medical Malpractice Act at [Tennessee Code Annotated section] 29-26-115 and a duty of ordinary care to follow that standard.

> 3.      Were the damages awarded in this case excessive for the injuries sustained and was fault appropriately allocated between the defendants.

> 4.      Was the trial court in error in questioning witnesses concerning the adequacy of staffing at Coffee Medical Center thereby introducing this issue into the trial when the issue had not been raised in the plaintiff's pleadings.

We conclude that the third issue is dispositive of the Medical Center's appeal. In arguing that the trial court improperly allocated fault in this case, the Medical Center argues, *inter alia*, that none of the fault for Limbaugh's injuries should have been allocated to the Medical Center because, under

the Governmental Tort Liability Act (GTLA),[3] the Medical Center cannot be held liable for the intentional tort of one of its employees.

Based on the decision of our supreme court in ***Potter v. City of Chattanooga***, 556 S.W.2d 543 (Tenn. 1977), we find this argument persuasive. In ***Potter***, the court considered whether the GTLA removed the defense of governmental immunity for injuries arising out of intentional torts committed by governmental employees. There, the plaintiff's complaint alleged that a police officer employed by the City of Chattanooga arrested the plaintiff for public drunkenness without probable cause. ***See Potter***, 556 S.W.2d at 544. Another officer, while forcing the plaintiff into a cell, battered the plaintiff about the face, causing her to suffer lacerations and broken bones and breaking her dentures. ***See id***.

The supreme court observed that the GTLA removed "the immunity of governmental entities from suit for damages where an injury [was] proximately caused by a negligent act or omission of any employee within the scope of his employment." ***Id***. By its own provisions, however, the GTLA did not remove governmental immunity where the injury arose out of "false imprisonment pursuant to a mittimus from a court, false arrest, malicious prosecution, intentional trespass, abuse of process, libel, slander, deceit, interference with contract rights, infliction of mental anguish, invasion of right of privacy, or civil rights." ***Id***. (quoting Tenn. Code Ann. § 23-3311(2)).[4] Citing this provision, the court held that

> [t]he injuries for which recovery is sought in this case arose out of the false arrest and battery described in the complaint and are within the exceptions to municipal liability set forth in [Tennessee Code Annotated section] 23-3311. It follows that the trial judge correctly dismissed the action against the City.

***Potter***, 556 S.W.2d at 546.

Following the ***Potter*** decision, the appellate courts of this state have repeatedly affirmed the principle that the GTLA does not permit plaintiffs to recover against governmental entities for injuries caused by the intentional torts of governmental employees. ***See, e.g.***, ***Tipton County Bd. of Educ. v. Dennis***, 561 S.W.2d 148, 152 (Tenn. 1978) ("Like many other statutes permitting recovery from governmental entities for tortious injuries, the [GTLA] contains several exceptions. It does not authorize any recovery at all for most willful or intentional torts."); ***Belk v. Obion County***, 7 S.W.3d 34, 40 (Tenn. Ct. App. 1999) ("The GTLA allows suit against county and municipal governments for negligent acts of its employees; however, neither intentional torts nor violations of civil rights are covered under the GTLA."); ***Gifford v. City of Gatlinburg***, 900 S.W.2d 293, 296 (Tenn. Ct. App. 1995) ("[T]here is no waiver of immunity under the [GTLA] for intentional

---

[3]***See*** Tenn. Code Ann. §§ 29-20-101 to -407 (1980 & Supp. 1996).

[4]The language of this provision has not changed since ***Potter*** was decided. ***See*** Tenn. Code Ann. § 29-20-205(2) (Supp. 1999).

tort."); *see also Cuzick v. Bass*, No. 02A01-9809-CV-00244, 1999 WL 145209, at \*4 (Tenn. Ct. App. Mar. 18, 1999) (*no perm. app. filed*) ("Claims involving allegedly intentional acts fall within the purview of the [GTLA] and are barred."). As our supreme court explained in one such case,

> [t]he GTLA codified the general common law rule that "all governmental entities [are] immune from suit for any injury which may result from the activities of said governmental entities," [Tenn. Code Ann.] § 29-20-201, . . . . After stating the general rule of immunity, removal of immunity is provided in specific instances. *See, e.g.*, [Tenn. Code Ann.] §§ 29-20-202 (negligent operation of vehicles but continuing certain statutory exceptions), 29-20-203 (unsafe streets and highways), 29-20-204 (dangerous structures). A general waiver of immunity from suit is then provided by [Tennessee Code Annotated section] 29-20-205 "for injury proximately caused by a negligent act or omission of any employee within the scope of his employment," but an extensive list of exceptions to this removal of immunity is appended to this section, including any injury that "[a]rises out of false imprisonment pursuant to a mittimus from a court, false arrest, malicious prosecution, intentional trespass, abuse of process, libel, slander, deceit, interference with contract rights, infliction of mental anguish, invasion of right of privacy, or civil rights. . . ." [Tenn. Code Ann.] § 29-20-205(2). *These exceptions and the others contained in this provision make it evident that, while the Legislature did envision a comprehensive scheme, the scope of the GTLA is generally intended to exclude intentional torts* as well as certain other torts involving intervening events (riots, etc.) or discretionary or necessary governmental activities.

*Jenkins v. Loudon County*, 736 S.W.2d 603, 608 (Tenn. 1987) (emphasis added) (citing *Potter v. City of Chattanooga*, 556 S.W.2d 543, 544-46 (Tenn. 1977)); *accord Montgomery v. Mayor of Covington*, 778 S.W.2d 444, 445 (Tenn. Ct. App. 1988).

In recent years, some decisions of this court have suggested that, although a plaintiff cannot recover under the GTLA for a governmental employee's intentional tort, a plaintiff might be able to recover for a governmental entity's independent negligence in hiring the employee who caused the plaintiff's injuries. *See, e.g.*, *Roberts v. Blount Mem'l Hosp.*, 963 S.W.2d 744, 748 (Tenn. Ct. App. 1997); *Doe v. Coffee County Bd. of Educ.*, 852 S.W.2d 899, 907-09 (Tenn. Ct. App. 1992); *see also Doe ex rel. Doe v. Rogers*, No. 03A01-9606-CV-00212, 1997 WL 36834, at \*1, \*3 (Tenn. Ct. App. Jan. 31, 1997) (*no perm. app. filed*). We find the logic of this approach appealing because, in such cases, the plaintiffs are not merely attempting to recover damages for the intentional torts of governmental employees. Rather, they are attempting to recover damages for the defendants' negligence in hiring the intentional tortfeasors and, specifically, their failure to adequately investigate the tortfeasors' backgrounds.

In our view, however, this approach was specifically considered and rejected by the supreme court in *Potter*. In that case, after the City of Chattanooga filed its motion to dismiss, the plaintiff amended her complaint to allege that

[t]hroughout this entire episode and prior thereto, defendant at no time screened its employees to adequately determine the psychological capabilities of its employees to handle the jobs to which they were assigned, and further failed to adequately test, screen and control its employees, to the point that at least one of defendant's employees during the instance previously alleged acted in a [berserk] and callous manner in violation of the duties of the defendant to the plaintiff, which actions defendants should have known or reasonably could have known were likely to have occurred.

*Potter*, 556 S.W.2d at 544. The supreme court rejected the plaintiff's contention that her amended complaint stated a cause of action for negligence under the GTLA. The court reasoned that

[i]t is apparent from a reading of the complaint, as amended, that the true bases of the injuries for which recovery of damages is sought are false arrest and assault and battery. The amendment to the complaint, while levelling additional charges of negligence against the City, does not alter the fact that the injuries that are the subject of the action "arose out of" the battery and the false arrest, and was not effective to avoid the immunity granted the City under [the GTLA].

*Id*. at 545. In so holding, the supreme court cited decisions from other jurisdictions that rejected attempts by plaintiffs to circumvent the defense of governmental immunity where plaintiffs had asserted that governmental entities were negligent in hiring or retaining intentional tortfeasors. *See id*. (citing *Little v. Schafer*, 319 F. Supp. 190 (S.D. Tex. 1970) (negligent hiring); *Salerno v. City of Racine*, 214 N.W.2d 446 (Wis. 1974) (negligent retention)).

Moreover, we note that, relying on *Potter*, this court recently affirmed the dismissal of a negligent hiring claim brought under the GTLA. As previously indicated, our decision in *Roberts v. Blount Memorial Hospital*, 963 S.W.2d 744, 748 (Tenn. Ct. App. 1997), suggested that, although the plaintiff could not recover under the GTLA for a hospital employee's intentional tort (sexual assault), the plaintiff might be able to recover for the hospital's independent negligence in failing to adequately investigate the employee's background before hiring him. Because the hospital's initial motion for summary judgment addressed only the employee's intentional acts, we reversed the trial court's grant of summary judgment on the issues relating to the hospital's independent negligence, and we remanded for further proceedings. *See Roberts*, 963 S.W.2d at 748-49.

On remand, the hospital filed another motion for summary judgment, and the trial court again granted the hospital's motion. *See Wisdom v. Maddry*, No. 03A01-9902-CV-00052, 1999 WL 894596, at *1 (Tenn. Ct. App. Oct. 14, 1999) (*no perm. app. filed*).[5] On appeal, therefore, this court was required to address the viability of the plaintiff's negligent hiring claim. *See Wisdom*, 1999 WL 894596, at *2. After discussing the supreme court's decision in *Potter*, we affirmed the dismissal of the plaintiff's claim. *See id*. In doing so, we reasoned that

---

[5]For reasons not pertinent to our present analysis, the style of the case changed on remand.

the plaintiff's injuries allegedly arose from the intentional conduct of [the hospital's employee]. We agree with the defendant that the immunity of the hospital cannot be circumvented in the manner attempted.

*Id*.[6]

In the present case, the Plaintiff alleged, and the trial court found, that the Medical Center's employee, Louise Ray, committed an intentional tort, assault and battery, upon Emma Ruth Limbaugh. Inasmuch as the GTLA does not permit a plaintiff to recover for the intentional torts of governmental employees, and inasmuch as our supreme court's decision in *Potter* does not permit a plaintiff to circumvent the defense of governmental immunity by asserting a claim for negligent hiring or retention, we conclude that the judgment entered against the Medical Center in this case must be reversed.

In reversing the trial court's judgment against the Medical Center, we reject the Plaintiff's argument that the Medical Center somehow waived the defense of governmental immunity. *See City of Lavergne v. Southern Silver, Inc.*, 872 S.W.2d 687, 690 (Tenn. Ct. App. 1993) (indicating that defense of governmental immunity cannot be waived because it goes to court's jurisdiction to entertain suit); *see also Morris v. City of Memphis*, No. 02A01-9403-CV-00041, 1995 WL 72539, at *2 (Tenn. Ct. App. Feb. 22, 1995) (*no perm. app. filed*) (indicating that governmental immunity defense is jurisdictional question that may be raised for first time on appeal). In any event, we note that the Medical Center raised this defense in its answer, its motion to dismiss, and its motion for summary judgment.

On the other hand, we affirm the trial court's judgment entered against Ray. Ray has submitted a brief on appeal in which she challenges the judgment against her on evidentiary grounds.[7] Our review of the trial court's judgment is governed by rule 13(d) of the Tennessee Rules

---

[6]The *Potter* decision was not mentioned in *Roberts*. In *Wisdom*, we explained this omission by stating that

> [o]ur first opinion [*Roberts*] is clear on the point that any independent negligence of the hospital was not addressed by the motion for summary judgment. It was for this reason that the judgment was reversed and the language of the opinion "we are not persuaded that this is an appropriate case for summary judgment" must be considered in proper context. The principle enunciated in *Potter vs. City of Chattanooga*, 556 S.W.2d 543 (Tenn. 1977) was not implicated because the issue of independent negligence was not addressed, as we have seen.

*Wisdom*, 1999 WL 894596, at *2.

[7]Although Ray did not file a notice that she was appealing the trial court's judgment against her, we note that the Tennessee Rules of Appellate Procedure did not require her to file a separate

of Appellate Procedure, which provides that, in civil actions, the appellate court's review of the trial court's findings of fact "shall be *de novo* upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). Under this standard, "[w]here the issue for decision depends on the determination of the credibility of witnesses," this court recognizes that "the trial court is the best judge of the credibility" and that "its findings of credibility are entitled to great weight" on appeal. *Tenn-Tex Properties v. Brownell-Electro, Inc.*, 778 S.W.2d 423, 426 (Tenn. 1989). This court defers to the trial court's findings of credibility "because the trial court alone has the opportunity to observe the appearance and the demeanor of the witnesses." *Id*. Accordingly, this court will affirm the trial court's judgment unless the evidence preponderates against the trial court's findings or unless the trial court has erred in applying the law. *See Dailey v. Bateman*, 937 S.W.2d 927, 930 (Tenn. Ct. App. 1996).

Applying the foregoing standard, we conclude that the evidence does not preponderate against the trial court's finding that Limbaugh's injuries were caused by Ray's assault and battery. We recognize that the record contains evidence to support Ray's version of events, just as the record contains evidence to support the Plaintiff's version. As the trier of fact, the trial court was required to consider the testimony presented by the parties and to decide which of the competing versions was more credible. While Ray's testimony provided a plausible explanation as to how the struggle between her and Limbaugh developed, significantly, Ray's version of events did not explain the source of Limbaugh's facial injuries. Ultimately, the trial court found that the weight of the evidence supported the Plaintiff's version of events, and, given the limited scope of our review, we are not in a position to second-guess the trial court's decision.

The trial court's judgment against the Medical Center is reversed. In all other respects, the trial court's judgment is affirmed, and this cause is remanded for further proceedings consistent with this opinion. Costs of this appeal are taxed one-half to the appellee, Eddie Brown Limbaugh, Executor of the Estate of Emma Ruth Limbaugh, and one-half to the appellee, Louise Ray, for which execution may issue if necessary.

---

notice of appeal. Rule 13(a) provides that, "[e]xcept as otherwise provided in Rule 3(e) [regarding appeals from jury trials], any question of law may be brought up for review and relief by any party. Cross-appeals, separate appeals, and separate applications for permission to appeal are not required." Tenn. R. App. P. 13(a). "The result of eliminating any requirement that an appellee file the appellee's own notice of appeal is that once any party files a notice of appeal the appellate court may consider the case as a whole." *Id*. advisory commission's comment. As we previously indicated, both the Plaintiff and the Medical Center filed notices of appeal in this case. Consequently, Ray was not required to file a separate notice of appeal.

In his brief, the Plaintiff has raised issues concerning the trial court's allocation of fault. Our reversal of the trial court's judgment against the Medical Center, however, renders these issues moot as to the Medical Center. Inasmuch as the Plaintiff's brief does not request any additional relief against Ray, we decline to address the issues raised by the Plaintiff.